IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ZAKIYAH TORO, | : | Civil No. 3:25-CV-986 |
| | : | |
| Plaintiff, | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | (Chief Magistrate Judge Bloom) |
| MOUNT AIRY #1, LLC, | : | |
| d/b/a Mount Airy Casino Resort, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

### I.    Introduction

This is a civil action filed by the *pro se* plaintiff, Zakiyah Toro.[1] The plaintiff's claims arise out of her former employment with the defendant, Mount Airy #1, LLC ("Mount Airy") in 2024 and 2025.[2]   In her proposed second amended complaint, Toro asserts claims of racial discrimination, retaliation, and hostile work environment pursuant to Title VII of the Civil Rights Act, the Pennsylvania Human Relations Act ("PHRA"), and 42 U.S.C. § 1981.[3]   She also asserts state law claims of

---

[1] Doc. 1.
[2] *Id.*
[3] Doc. 17-1.

negligent retention and supervision and intentional infliction of emotional distress ("IIED").[4]

Toro filed a motion for leave to proceed *in forma pauperis* with her initial complaint, which we granted.[5]   However, we deferred the mandatory screening of the complaint, as it was apparent the plaintiff had not yet exhausted her administrative remedies with respect to her Title VII claims.[6]   The plaintiff has now filed a motion to amend her complaint, attaching her proposed second amended complaint and Right to Sue letter from the Equal Employment Opportunity Commission ("EEOC").[7]   After consideration, we will recommend that the plaintiff's motion be granted, that her state law tort claims be dismissed, and that she be issued a summons for service of the second amended complaint on the defendant with respect to her Title VII, PHRA, and Section 1981 claims.

---

[4] *Id.*

[5] Doc. 9.

[6] *Id.*

[7] Doc. 17.

## II.   Background

According to the second amended complaint, Toro, an African American woman, began employment with Mount Airy as a part-time cocktail server in December of 2023 and completed her 90-day probationary period on March 6, 2024.[8]   Toro alleges that on January 31, 2024, she was subjected to discriminatory treatment when she was disciplined for violating Mount Airy's policy regarding use of the restrooms designated for guests.[9]   She asserts that her Caucasian coworkers also used the guest restrooms in violation of the policy but were not disciplined.[10]   She claims that after she reported this discriminatory treatment the next day, she was sent home from her shift, and no one responded to her complaint.[11]

Toro then alleges that on May 26 and 27, 2024, her supervisor, Alissa McDermott, assigned her to less desirable and lower-revenue sections than her less-experienced white coworkers.[12]   Toro submitted a

---

[8]  Doc. 17-1 ¶¶ 14-15.
[9]  *Id.* ¶ 22.
[10]  *Id.*
[11]  *Id.* ¶ 23.
[12]  *Id.* ¶ 24.

formal complaint to her manager, Elaine Pinto, who Toro alleges failed to investigate her complaints.[13]   Rather, she asserts that on May 30, she was issued a written warning citing her for excessive absenteeism, which she claims was fabricated and deficient.[14]   Toro also asserts that the writeup was issued by a supervisor, Lynn M., who she had reported for misconduct in January of 2024.[15]   Toro alleges that at a later time, the defendant removed absentee points that were given to her in error and subsequently revised its attendance tracking system in December of 2024, undermining the legitimacy of the writeup.[16]

Toro also experienced what she characterizes as racial harassment beginning in July of 2024.[17]   She alleges that a coworker, Traci Spina, would not share workspace with her and made comments suggesting she only wanted to work with white coworkers.[18]   Spina also told the plaintiff that she was the "lowest person on the totem pole."[19]   Toro

---

[13] *Id.* ¶¶ 24-25.
[14] *Id.* ¶ 26.
[15] *Id.* ¶ 26(a).
[16] *Id.* ¶¶ 26(a), 26(b).
[17] *Id.* ¶ 28.
[18] *Id.*
[19] *Id.*

reported this conduct to McDermott, as well as two other supervisors, but she claims no one investigated her complaints.[20]   Around this same time, Toro alleges that McDermott continued to assign her unfavorable sections compared to her white coworkers.[21]   Toro reported this to two managers, Julie and Danielle, and while a meeting was apparently held, no action was taken.[22]   Thus, on or about July 21, Toro filed a formal complaint with Human Resources Manager Susan Menichiello, detailing the alleged racial discrimination and unfair treatment.[23] Menichiello acknowledged the complaint but took no action.[24]   Toro also reported McDermott's conduct to Danielle, and Danielle refused to move McDermott from the night shift.[25]

In October of 2024, Toro was involved in an incident with a coworker, Vanessa Capriglione.[26]   Toro alleges that she witnessed Capriglione, who is white, violate the defendant's beverage policy, and

---

[20] *Id.*
[21] *Id.* ¶ 29.
[22] *Id.*
[23] *Id.* ¶ 30.
[24] *Id.*
[25] *Id.* ¶ 30(a).
[26] *Id.* ¶ 31.

that Capriglione started a verbal altercation with Toro.[27]  She claims that McDermott was present and witnessed the encounter, yet Toro was painted as the person who initiated the encounter.[28]  Both women were ultimately disciplined for the encounter, but Toro alleges that while the scrutiny against her escalated, the defendant never held Capriglione accountable for the policy violation.[29]  Additionally, Toro asserts that her discipline, issued by Menichiello, characterized her as "rude," which she alleges is a common racial stereotype of black women.[30]  The discipline also asserted Toro violated a policy regarding interactions with or around customers, but Toro claims the incident occurred between coworkers and without any guests present.[31]  Toro also alleges that during the investigation of the incident, she was interviewed by Gretchen Holzhauser, the Vice President of Human Resources, who allegedly painted the plaintiff as the person in the wrong instead of Capriglione.[32]

---

[27] *Id.*
[28] *Id.*
[29] *Id.* ¶ 32.
[30] *Id.* ¶ 36.
[31] *Id.*
[32] *Id.* ¶ 35.

A few days after this incident on October 11, 2024, Toro was arrested by Pennsylvania State Police Troopers at Mount Airy regarding an incident that Toro claims was unrelated to her work.[33]   She alleges that she was released the next day and disclosed the matter to the defendant, but she was placed on unpaid administrative leave for three weeks.[34]

When Toro returned to work in November, she reported another coworker, Carmen Colon, to McDermott for a violation of the beverage policy.[35]   She asserts that Colon insulted her when confronted, and that McDermott sent Toro home after she reported the incident. [36] McDermott also allegedly told Toro she would not be making a report of the incident.[37]   However, several days after the incident, the defendant took a written statement from Colon regarding the incident with the plaintiff. [38]   Toro alleges that this statement was not submitted

---

[33] *Id.* ¶¶ 33.
[34] *Id.*
[35] *Id.* ¶ 38.
[36] *Id.* ¶¶ 38-39.
[37] *Id.* ¶ 39.
[38] *Id.* ¶ 40.

contemporaneously with the incident, and thus, she believes it was part of a coordinated effort to build a case against her.[39]

Later in November, Capriglione reported the plaintiff for a violation of the beverage policy and gave a written statement to the defendant indicating Toro initiated a verbal altercation.[40]   While another coworker was identified as a witness, she never gave a statement to the defendant.[41]   Toro contends that the defendant later admitted that there was no verbal altercation.[42]   She also alleges that while she was sent home, Capriglione was able to stay and finish out her shift.[43]   Toro was ultimately suspended pending an investigation into the two November incidents with her coworkers.[44]   While her suspension was initially characterized as disciplinary, when she requested a form to appeal the suspension, she was told it was "investigatory" and she had no right to appeal.[45]   She also contends that the two white employees involved in

---

[39]  *Id.*
[40]  *Id.* ¶ 41.
[41]  *Id.* ¶ 42.
[42]  *Id.*
[43]  *Id.* ¶ 42(a).
[44]  *Id.* ¶ 43.
[45]  *Id.* ¶¶ 43, 46.

the incidents were permitted to continue working while she was suspended.[46]

The investigation into these incidents was undertaken by Lianne Asbury, whom the plaintiff claims was a subject of her own complaints of racial discrimination. [47]   Toro alleges that Asbury denied her the opportunity to have legal representation during her interview, which led to a biased and targeted interview of the plaintiff.[48]   Toro further asserts that her complaints against Holzhauser and Menichiello were investigated at the same time, and that her allegations against them were improperly found to be unsubstantiated. [49]   During the investigation, Toro attempted to escalate her complaints to the Chief Operating Officer, Todd Greenburg.[50]   She claims she was stonewalled and refused his information and redirected back to Menichiello, against

---

[46] *Id.* ¶ 45.
[47] *Id.* ¶ 47.
[48] *Id.* ¶ 51.
[49] *Id.* ¶ 48.
[50] *Id.* ¶ 49.

whom she had filed a complaint.[51]    Her complaints ultimately reached

Greenburg but no action was taken.[52]

Following the investigation, Toro's employment was terminated on

January 21, 2025.[53]    The reasons listed for her termination included

Toro's alleged "unprofessional conduct," her prior disciplinary record, her

interactions with coworkers, and her coworkers' apparent "fear" of Toro's

workplace conduct.[54]    Her termination letter was signed by Asbury,

against whom she filed a complaint, and Greenburg, the COO.[55]    She

was simultaneously presented with a severance agreement, requesting

that she waive any rights to sue in exchange for $2,858.88.[56]    This

agreement also included a provision that the defendant would represent

to future employers that the plaintiff voluntarily resigned, which Toro

---

[51]  *Id.*
[52]  *Id.*
[53]  *Id.* ¶ 53.
[54]  *Id.*
[55]  *Id.*
[56]  *Id.* ¶ 54.

10

claims undermines the seriousness of the alleged conduct that resulted in her termination.[57]   Toro did not sign the agreement.[58]

Thus, after filing a complaint with the EEOC, Toro filed this lawsuit.[59]   Her proposed second amended complaint asserts claims of racial discrimination, retaliation, and hostile work environment in violation of Title VII, the PHRA, and Section 1981.   She also asserts claims of negligent retention and supervision and IIED.   Because Toro was granted leave to proceed *in forma pauperis* in this action, her amended complaint is subject to a mandatory screening review.[60]

After consideration, we conclude that Toro's second amended complaint sufficiently alleges claims of discrimination, retaliation, and a hostile work environment.   Accordingly, we will recommend that her motion be granted, her second amended complaint be deemed filed, and that she be issued a summons for service of the second amended complaint on the defendant as to these claims.   However, we will

---

[57] *Id.*

[58] *Id.*

[59] Doc. 1.

[60] 28 U.S.C. § 1915(e)(2)(B)(ii).

11

recommend that her negligent retention and supervision and IIED claim be dismissed.

## III.    Discussion

### A. Screening of *Pro Se* Complaints – Standard of Review

We have a statutory obligation to preliminarily review *pro se* complaints brought by plaintiffs given leave to proceed *in forma pauperis*.[61]    We review such complaints to determine whether there are frivolous or malicious claims, or if the complaint fails to state a claim upon which relief may be granted. [62]    This statutory preliminary screening mirrors review under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted."[63]

With respect to this legal benchmark, under federal pleading standards a plaintiff is required to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." [64]    In

---

[61]  *Id.* § 1915(e)(2)(B)(ii).
[62]  *Id.*
[63]  Fed. R. Civ. P. 12(b)(6).
[64]  Fed. R. Civ. P. 8(a)(2).

12

determining whether a complaint states a claim for relief under this pleading standard, a court must accept the factual allegations in the complaint as true and accept "all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant."[65]    However, a court is not required to accept legal conclusions or "a formulaic recitation of the elements of a cause of action."[66]

As the Third Circuit Court of Appeals has aptly summarized:

[A]fter *Iqbal*, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. *Id.* Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 1950. In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. *See Phillips*, 515 F.3d at 234–35. As the Supreme Court instructed in *Iqbal*, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 129 S.Ct. at 1949. This "plausibility"

---

[65] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).
[66] *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").

13

determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*[67]

Generally, when considering a motion to dismiss, a court relies on the complaint and its attached exhibits, as well as matters of public record.[68]   A court can also consider "undisputedly authentic document[s] that a defendant attached as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents."[69]   Additionally, if the complaint relies on the contents of a document not physically attached to the complaint but whose authenticity is not in dispute, the court may consider such document in its determination.[70]   However, the court may not rely on any other part of the record when deciding a motion to dismiss.[71]

Finally, when reviewing a *pro se* complaint, we are reminded that such complaints are to be construed liberally, "so 'as to do substantial

---

[67] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

[68] *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007).

[69] *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

[70] *See Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002).

[71] *Jordan*, 20 F.3d at 1261.

justice.'"[72]   We must apply the relevant law even if the *pro se* plaintiff does not mention it by name.[73]

B. <u>The Second Amended Complaint Should be Served on the Defendant as to Toro's Discrimination, Retaliation, and Hostile Work Environment Claims.</u>

After consideration, we conclude that the second amended complaint sufficiently alleges facts to support the plaintiff's discrimination, retaliation, and hostile work environment claims at this stage.

Title VII, the PHRA, and Section 1981 prohibit employers from discriminating against employees on the basis of their race.[74]   With respect to a claim of racial discrimination under these statutes,[75] a plaintiff must allege that (1) she is a member of a protected class; (2) she was qualified for the position she was in; (3) she suffered an adverse

---

[72] *Alston v. Parker*, 363 F.3d 229, 234 (3d Cir. 2004) (quoting Fed. R. Civ. P. 8(f)).

[73] *Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003) (citing *Higgins v. Beyer*, 293 F.3d 683, 688 (3d Cir. 2002)).

[74] 42 U.S.C. § 2000e-2(a); 43 Pa. Cons. Stat. § 955(a); 42 U.S.C. § 1981.

[75] Claims under each of these provisions are subject to the same legal analysis.  *See Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (Title VII and § 1981); *Fogelman v. Mercy Hospital*, 283 F.3d 561, 567 (3d Cir. 2002) (Title VII and PHRA).

15

employment action; and (4) there are circumstances giving rise to an inference of unlawful discrimination.[76]   To satisfy the fourth element, a plaintiff must show that "similarly-situated persons outside the protected class were treated more favorably."[77]

Here, we conclude that Toro has alleged sufficient facts at this stage for her discrimination claims to proceed.   First, she alleges she is a member of a protected class as an African American.   Second, she asserts that she was hired and completed her probationary period of employment, and that prior to her reports of misconduct, she faced no disciplinary action.   Third, Toro alleges she was subjected to several adverse employment actions, including written disciplines, being sent home from her shifts, being suspended without pay, and ultimately being terminated.

Finally, Toro alleges facts from which we can draw an inference of racial discrimination.   The second amended complaint asserts that several of Toro's white coworkers engaged in the same conduct or violated

---

[76] *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

[77] *Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp. 3d 571, 589 (E.D. Pa. 2017).

the same policies and yet were not disciplined or terminated like Toro. For example, Toro claims that she was disciplined for violating the restroom policy, but white coworkers were not.   She further alleges that the white coworkers involved in the beverage policy violation incidents were allowed to continue their shifts at work whereas she was sent home, suspended, investigated, and ultimately terminated.   Additionally, Toro asserts that in all of the incidents that led to her disciplines and termination, she was painted as the aggressor and characterized as "rude" and "unprofessional," which she claims is a racial stereotype of black women.[78]   In our view, the allegations are sufficient at this stage for Toro's discrimination claims to proceed.

These statutes also prohibit employers from retaliating against employees who oppose unlawful activity.[79]   As to her retaliation claims, Toro must show that (1) she engaged in protected activity; (2) she suffered

---

[78] *See Brooks v. Chester Valley Golf Club*, 2025 WL 3210349, at *6 (E.D. Pa. Nov. 17, 2025) (recognizing that the "angry black woman" stereotype can serve as evidence of discriminatory animus).

[79] 42 U.S.C. § 2000e-3(a); 42 Pa. Cons. Stat. § 955(d); *CBOCS West, Inc. v. Humphries*, 533 U.S. 442, 451 (2008) (finding that Section 1981 encompasses retaliation claims).

17

an adverse employment action; and (3) a causal connection between the protected activity and adverse employment action.[80]   Toro's second amended complaint alleges that she reported what she believed to be racial discrimination and harassment to her supervisors and other management-level individuals of the defendant.   She asserts that after making these reports, she was subjected to fabricated disciplines, being sent home from shifts, suspension, and ultimately, termination.

Finally, we can infer a causal connection based on the allegations regarding timing.   To show causation, a plaintiff must allege either (1) unusually suggestive timing, or (2) "timing plus other evidence."[81]   Here, some of the alleged adverse actions occurred mere days after Toro made her complaints or reports.   For example, Toro claims that three days after she reported her supervisor for assigning her less desirable, less income-generating sections than her white coworkers, she received a warning for excessive absenteeism based on points that were later

---

[80] *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006).

[81] *Brugh v. Mount Aloysius College*, 432 F. Supp. 3d 566, 584 (W.D. Pa. 2020) (quoting *Williams v. Phila. Housing Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (internal quotation marks omitted)).

removed by the defendant for inaccuracy. Additionally, Toro alleges that after she complained of the discriminatory treatment and attempted to escalate her complaints while she was suspended, she was stonewalled and directed back to an individual against whom she had made a complaint of discrimination. Toro has also alleged facts, as we will discuss below, from which we can infer a pattern of discriminatory behavior toward her. Accordingly, at this preliminary screening stage, we conclude Toro has alleged enough for her retaliation claims to proceed.

Finally, with respect to her hostile work environment claims, a plaintiff must show that "1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability."[82] A hostile work environment is judged by an objective standard, requiring a reasonable person to find that the environment is hostile.[83] In

---

[82] *Mandel v. M7Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).
[83] *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993).

determining a hostile work environment, courts look at the totality of the circumstances, including: "the frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance."[84]

As we have explained, Toro's allegations are sufficient to establish intentional discrimination based on her race.   We also conclude that the allegations, taken as true, could establish that the discrimination was severe or pervasive.   For harassment to be actionable, it must be so severe or pervasive as to "alter the conditions of [the victim's] employment and create an abusive working environment."[85]   Here, Toro has alleged that she received less favorable sections due to her race that generated less income, that she was involved in several incidents with white coworkers in which she was painted as the aggressor because of a racial stereotype, and that this happened several times over the course of seven months, resulting in writeups, disciplines, a suspension, and her

---

[84] *Castleberry*, 863 F.3d at 264 (quoting *Harris*, 510 U.S. at 22).
[85] *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (citation omitted).

eventual termination. She also asserts that after she made complaints and reports of discrimination, the defendant appointed someone who she had made a report against as the investigator. At this stage, we think these allegations are sufficient to show that the discrimination was severe or pervasive.

Additionally, Toro has alleged that she was detrimentally affected by the discrimination and harassment. Toro asserts that she made 17 documented complaints during her 13-month employment with the defendant. She alleges that she was continuously assigned to less desirable sections as opposed to her white coworkers, and that she asked for McDermott to be assigned to another shift because she was uncomfortable working under her. She also alleges that when she was involved in incidents with her white coworkers, she was constantly painted as the aggressor, and her coworkers were permitted to continue working and she was sent home from her shift and unable to give her side of the story. Accordingly, we believe that these allegations are sufficient at this stage to support that the harassment detrimentally affected the plaintiff and would affect a reasonable person under similar

21

circumstances.

Finally, Toro has alleged enough to establish employer liability. There are two ways a plaintiff may establish employer liability: when a supervisor commits the harassment, or when a coworker commits the harassment and the employer failed to take remedial action.[86]    If the plaintiff's harasser is a supervisor, and the "harassment culminates in a tangible employment action, the employer is strictly liable."[87]    But if the conduct does not result in a tangible employment action, the employer may raise an affirmative defense, asserting that "(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided."[88]

If the plaintiff's harasser is a coworker, however, the employer is only liable "if it was negligent in controlling working conditions."[89] Thus, a plaintiff alleging coworker-on-coworker harassment must show

---

[86] *Bumbarger v. New Enterprise Stone and Lime Co., Inc.*, 170 F. Supp. 3d 801, 837-38 (W.D. Pa. 2017) (citations omitted).

[87] *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).

[88] *Id.* (citations omitted).

[89] *Id.*

22

either that the employer failed to provide adequate remedial measures, or that "the employer knew or should have known about the harassment and failed to take prompt and appropriate remedial action."[90]

Here, construing the *pro se* complaint liberally, Toro alleges both theories of employer liability. She asserts that her supervisors, including McDermott, Menichiello, Holzhauser, and Asbury, took tangible employment actions against her when they assigned her to less-desirable sections, affecting her earnings; suspended her; and ultimately terminated her employment. She further alleges that she experienced harassment by coworkers, including Spina, Capriglione, and others, and that when she reported the harassment, her supervisors failed to take any action to remedy the harassment. Accordingly, at this stage, we believe Toro has alleged enough for her hostile work environment claims to proceed forward.

### C. Toro's State Law Tort Claims Should be Dismissed.

Finally, Toro asserts two state law claims against Mount Airy—

---

[90] *Jenkins v. Ciocca Management, Inc.*, 762 F. Supp. 3d 416, 423 (E.D. Pa. 2025) (internal citations and quotation marks omitted).

23

negligent supervision and retention and IIED.   But as we will explain, these two state law claims fail as a matter of law and should be dismissed.

First, the plaintiff's negligent supervision and retention claim is preempted by the PHRA.   The PHRA "was intended by the Pennsylvania legislature to exclude common law tort claims based upon discrimination which could be remedied under the Act."[91]   Thus, "[t]he PHRA bars actions 'based on the same grievance,' which concern the forms of discrimination 'declared unlawful by section 5 of this Act.'"[92] Here, the *pro se* plaintiff's negligent supervision and retention claim is based on the same conduct and actions underlying her discrimination claims under the PHRA.   Accordingly, we conclude that the PHRA preempts the plaintiff's state law negligence claim.

As to her IIED claim, we conclude that this claim fails as a matter of law.   A claim for IIED under Pennsylvania law requires that a plaintiff establish: (1) extreme and outrageous conduct by the defendant;

---

[91] *Fantazzi v. Temple Univ.*, 2001 WL 872455, at *2 (E.D. Pa. June 11, 2001) (citing *Murray v. Commercial Union Ins. Co.*, 782 F.2d 432, 437 (3d Cir. 1986)).

[92] *Klingaman v. J&R Schugel Trucking*, 2025 WL 3079978, at *2 (E.D. Pa. Nov. 4, 2025) (quoting 43 Pa. Cons. Stat. § 962(b)).

24

(2) that the conduct is intentional or reckless; (3) that the conduct causes emotional distress; and (4) that the distress suffered is severe.[93]  For conduct to be considered extreme and outrageous, it must go "beyond all possible bounds of decency," so as to be "regarded as atrocious, and utterly intolerable in a civilized society."[94]

Here, Toro's amended complaint fails to allege the necessary "extreme and outrageous" conduct to state an IIED claim.  As the Third Circuit has noted, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress."[95]  Accordingly, "allegations of racial discrimination, even when coupled with retaliatory conduct, are not sufficiently outrageous conduct to state a claim for intentional infliction of emotional distress."[96]

---

[93] *Hoy v. Angelone*, 691 A.2d 476, 481 (Pa. Super. Ct. 1997) (citations omitted).

[94] *DiSalvio v. Lower Merion High School Dist.*, 158 F.Supp.2d 553, 561 (E.D. Pa. 2001) (quoting *Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988, 990-91 (Pa. 1987)).

[95] *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988).

[96] *Johnson v. Sch. Dist. of Phila.*, 2024 WL 1773358, at *5 (E.D. Pa. Apr. 24, 2024) (quoting *Parker v. Cenlar FSB*, 2021 WL 22828, at *6 (E.D. Pa. Jan. 4, 2021) (internal quotation marks omitted)).

25

Here, Toro relies on her allegations of racial discrimination, coupled with retaliatory conduct, to support her IIED claim.  This is insufficient to establish extreme and outrageous conduct, and as such, this state law claim should be dismissed.

## IV.    Recommendation

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that:

1. The plaintiff's motion be GRANTED, the and the second amended complaint[97] be DEEMED FILED;

2. The plaintiff's negligent supervision and retention and IIED claims be DISMISSED; and

3. The plaintiff be issued a summons for service of the second amended complaint on the defendant with respect to her claims under Title VII, the PHRA, and Section 1981.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or

---

[97] Doc. 17-1.

matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 14th day of May 2026.

*s/ Daryl F. Bloom*
Daryl F. Bloom
Chief United States Magistrate Judge

27